IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Duncan Toney, through Power of Attorney for Beatrice Toney, <br><br> Plaintiff, <br><br> vs. <br><br> Ability Insurance Company, <br><br> Defendant. | C.A. No. 3:10-cv-2311-CMC <br><br> OPINION AND ORDER ON DEFENDANT'S MOTION FOR LEAVE TO FILE AND SECOND MOTION FOR SUMMARY JUDGMENT |

This matter is before the court on Defendant's motion for leave to file a second motion for summary judgment and on the underlying second motion for summary judgment. Both motions have been fully briefed and are granted for the reasons set forth below.[1]

**Motion for Leave to File Second Motion for Summary Judgment.** Although they disagree as to how the court should exercise its discretion, the parties agree that the court may exercise its discretion to allow a second motion for summary judgment. *See* Dkt. No. 49-6 (Defendant's brief noting "courts universally permit the submission of successive or supplemental motions for summary judgment, especially when the factual record has been expanded or amplified"); Dkt. No. 56 at 5 (Plaintiff's brief noting that court "may grant a motion for leave to file a second motion for summary judgment at its discretion should it determine that a dispute of material facts has been resolved").

---

[1] Plaintiff, Duncan Toney ("Plaintiff"), pursues this matter on behalf of Beatrice Toney ("Ms. Toney"), who was insured under a long-term care policy issued by Medico Insurance Company ("Medico"). Defendant Ability Insurance Company ("Ability") assumed responsibility for coverage under that policy at some point prior to institution of this litigation. It is undisputed that Ms. Toney is now incapacitated and that Plaintiff has standing to bring this action on her behalf.

Under the circumstances of this case, the court concludes that judicial economy favors consideration of the second motion for summary judgment because it may (and in fact does) resolve all issues for trial.[2] Defendant's motion for leave to file a second motion for summary judgment is, therefore, granted.

**Controlling Policy.** Were the court required to rule on the issue, it would likely find genuine issues of material fact remain as to which of the two competing policy forms controls.[3] On the one hand, Ability has offered substantial support for its position that the policy *actually issued* to Ms. Toney was, necessarily, governed by the 1989 S Form because that was the only form which might have been issued in South Carolina when Ms. Toney purchased her policy. On the other hand, Plaintiff has offered undisputed evidence that Ability or its predecessor repeatedly mailed copies of the 1990 SC Form to Ms. Toney when she requested "duplicates" of her policy and while she remained in a premium paying status.[4] There is no direct evidence that Ms. Toney was ever actually

---

[2] The court reaches this conclusion despite disagreement with Defendant's argument that the issues now raised could not have been anticipated at the time it filed its original motion for summary judgment.

[3] Ability maintains that a form marked MP3358S ("1989 S Form") is controlling because it was the only form available in 1989 when Medico issued a policy to Ms. Toney. *See* Dkt. No. 32-1 ¶¶ 2,3 (affidavit of Donald Lawlor, Esquire, an officer of Ability). Plaintiff maintains that a form marked MP3358SC ("1990 SC Form") is controlling because it was the form Medico and Ability provided when Ms. Toney (or others acting on her behalf) asked for a duplicate copy on multiple occasions beginning in 2003. The court's choice of designation (1989 S Form and 1990 SC Form) is for convenience only and reflects the dates Ability maintains the different policy forms were available for issuance in South Carolina. Neither form includes any reference to effective dates.

[4] It is undisputed that at least three duplicates using the 1990 SC Form were mailed to Ms. Toney, the first in 2003. *See*, *e.g.*, Dkt. No. 65 at 3 (conceding record reflects that "Medico mistakenly sent Ms. Toney duplicate copies of the 1990 SC Form on three occasions," the first being on November 11, 2003); Dkt. No. 34-4 (letter dated 11/11/2003 enclosing "a duplicate of your policy as requested"); Dkt. No. 49-5 ¶ (Klostermeyer affidavit conceding that "duplicate policies printed from [the 1990 SC Form] subsequently were transmitted by [Ability's predecessor] to Ms. Toney and to Duncan Toney" but arguing that the form used "was an error, attributable to oversight on the part of support personnel in the underwriting department."). Quarterly premium payments

2

provided with a copy of the 1989 S Form.[5] While the court finds it unnecessary to make a final ruling on this issue, it would, if required to rule, find Plaintiff's evidence sufficient to raise a genuine issue of material fact as to whether Ability's predecessor misled Ms. Toney as to the terms of her coverage by repeatedly sending the wrong policy form in response to requests for a duplicate policy. *See Campbell, Inc. v. Northern Ins. Co. of N.Y.*, 337 F. Supp. 2d 764, 769 (D.S.C. 2004) (as a general rule, "insurance coverage may not be expanded or created by waiver or estoppel"); *Cresent Co. of Spartanburg, Inc. v. Ins. Co. of N. Am.*, 148 S.E.2d 369, 371 (1966) (noting exception to general rule "if the insurer has misled the insured into believing the particular risk is within the coverage."). The court need not, however, resolve the question of which policy controls or whether the dispute presents an issue for trial. This is because Plaintiff's claims fail under either policy form for the reasons addressed below.

**Critical Definition.** Although they define the term differently, both the 1989 S Form and the 1990 SC Form require that the insured be receiving care in a "Nursing Facility."[6] For reasons explained below, the facility in which Ms. Toney resides (the only facility for which Plaintiff has

---

continued to be made by or on behalf of Ms. Toney until she qualified for waiver of premiums in the spring of 2010. *See* Dkt. No. 65 at 3 (noting quarterly payments were made through May 10, 2010, and that the last payment was refunded because Ms. Toney had then qualified for waiver of premiums).

[5] Beyond an inference that Ms. Toney was likely mailed a copy of the 1989 S Form because it was the only one approved for issuance in South Carolina at the time her policy issued, there is no evidence that Ms. Toney ever received a copy of the 1989 S Form policy. *See* Dkt. No. 65 at 2.

[6] *See* Dkt. No. 49-2 at 9 (1989 S Form defining Nursing Facility); *id.* at 10 (1989 S. Form requiring as one condition of coverage that the insured "be confined in a nursing facility for long-term care of a covered condition"); *id.* at 16 (1990 SC Form defining "Nursing Facility"); *id.* at 18 (requiring as one condition of coverage that the insured "be confined in a nursing facility as defined" in the policy).

made a claim for benefits) does not meet either policy form's definition of this term. It follows that Plaintiff's claim fails regardless of which policy form applies.

**1989 S Form Definition.** The definition of "Nursing Facility" in the 1989 S Form requires that the facility be "licensed as a skilled nursing facility or intermediate care facility by the state in which it is located." Dkt. No. 49-2 at 9. Ability has presented undisputed evidence that Sterling House was licensed as a "Community Residential Care Facility," not as a skilled nursing or intermediate care facility. *See, e.g.,* Dkt. No. 49-8 at 17 (Duncan Toney dep. at 70, conceding Sterling House was so licensed); Dkt. No. 49-7 at 2 ("Facility Information Inquiry Form" completed by Sterling House and listing type of license as "Community Residential Care Facility"). It follows that Plaintiff's claim for benefits fails under the terms of the 1989 S Form.

**Application of 1990 SC Form Definition.** The definition of "Nursing Facility" in the 1990 SC Form requires, *inter alia*, that the facility have "a physician available to furnish medical care in case of an emergency." Dkt. No. 49-2 at 16. After Ms. Toney was admitted to Sterling House, a Sterling House representative completed a "Facility Certification of Care" form. This form, which was provided by Ability, included the following inquiry: "Does the facility have a Medical Director or an MD available to provide medical care in case of an emergency?" The individual completing the form checked "no." Dkt. No. 49-6 at 2. The same inquiry was included and response given on a "Facility Information Inquiry Form," also provided by Ability. Dkt. No. 49-7 at 2.

Plaintiff maintains that the form was completed incorrectly and that Sterling House, in fact, has a physician who is available to provide medical care in case of an emergency: Dale R. Hamrick, M.D. Dr. Hamrick's testimony does not, however, support Plaintiff's position. Instead, it demonstrates that Dr. Hamrick has a doctor-patient relationship with some patients at Sterling

4

House, will come to that facility to treat *his* patients if called and *if he is available*, but does not represent that he is on call for emergencies at the facility. Dr. Hamrick testified, in part, as follows:

> Q: So, . . . you see patients [at Sterling House] on an as-needed basis when you're available.
>
> A: That's correct.
>
> * * *
>
> Q: [D]o you represent that you're not on emergency call for patients?
>
> A: That's correct.
>
> Q: And since you work for patients and not facilities, are you on call for the medical emergencies of facilities?
>
> A: Only for my patients.
> Q: For your patients, not for facilities; is that correct?
>
> A: That is correct, not for facilities.

*See* Dkt. No. 49-8 at 27-32 (dep. p. 16–17). *See also id.* at 16 (explaining "if they catch me at home working in the garden and need me, I'll come see them. But, for example, tomorrow I'm going to see my father in North Carolina and I won't be able to handle patients then. And they express that understanding.").

Plaintiff characterizes Dr. Hamrick's testimony as "actually" stating that "he was available for a certain amount of emergency care." Dkt. No. 56 at 12. Plaintiff does not, however, cite to Hamrick's deposition or even quote his precise language which, as noted above, indicates Dr. Hamrick does not work for the facility and is not always available to provide care even for "his" patients, much less available to provide care to others in the event of an emergency. Thus, even if Dr. Hamrick is *sometimes* available to provide "a certain amount of emergency care," this is not sufficient to satisfy the policy definition.

5

Plaintiff also relies on the testimony of Felicia Dunham, nurse manager at Sterling House, who testified as its corporate representative. Plaintiff relies, most heavily, on Dunham's statement that the "no" response to the inquiries on the forms referenced above was incorrect. *See* Dunham dep. at 37; *see also id.* at 41 (indicating physician availability has been the same for her tenure which began in May 2011). This isolated comment does not, however, support Plaintiff's position when considered in light of the remainder of Dunham's testimony. For example, Dunham conceded that "the physician would not be available to provide emergency care." Dkt. No. 62-4 at 3 (Dunham dep. at 47). Instead, the facility

> would notify the physician . . . give the physician what we call vital signs, what's actually going on with the resident; and then, at that time . . . he or she can make their clinical judgment as to further direct us either to, one, send them out or to monitor them until he or she is available to physically come to the community to see them if it is not a true emergency. If it's a true emergency, then we would send them out.

*Id. See also id.* at 54-55, 57 (conceding she was not aware of any authority for the proposition that a phone consultation constitutes providing medical care in the event of an emergency and that this was just her personal opinion); *id.* at 56 (conceding that she was testifying as corporate representative but that her opinion regarding what constituted medical care was only her personal opinion); *id.* at 58 (indicating Dr. Hamrick and another doctor were not employed by or otherwise affiliated with Sterling House, but had physician-patient relationships with some residents).

Plaintiff argues that the practice followed by Sterling House (as explained by Dunham) "qualif[ies] under the terms of the policy, [and] is the only logical procedure." The court disagrees. The plain language of the policy requires that a physician be [1] *available* to [2] *provide medical care* in case of an emergency. Having a physician who is available to give phone advice regarding whether emergency care is needed is not the equivalent of having a physician available to provide

6

that care.  Likewise, a physician who is *sometimes* available to come to the Facility to provide medical care is not the same as having a physician who is available to provide care in the event of an emergency.

In sum, the evidence shows that there were two physicians who were sometimes available to provide care to patients at Sterling House.  Neither physician worked for the facility.  Instead, they provided care to patients with whom they had a doctor-patient relationship.  If an apparent emergency arose, and these physicians were available, they would provide phone advice regarding whether emergency care was needed.  If emergency care was needed, the facility was directed to transport the resident to the emergency room.  Even assuming the physician might, in some instances, respond by immediately coming to the facility to provide care, there is no evidence to suggest this was the norm rather than an exception.  Thus, the evidence is insufficient to support a finding that Sterling House had a physician available to "furnish medical care in case of an emergency."  It follows that Plaintiff's claim for benefits fails under the terms of the 1990 SC Form.

**Breach of Contract Claim**.  For reasons explained above, Sterling House does not satisfy the definition of Nursing Facility found in either the 1989 S Form or the 1990 SC Form.  It follows that Plaintiff's first cause of action fails as a matter of law under either policy form, making it unnecessary for the court to determine which version controls.

**Claim for Bad Faith Failure to Pay Benefits.**  The reasons supporting summary judgment as to Plaintiff's claim for breach of contract also support denial of his claim for bad faith failure to pay benefits: the denial was based on valid grounds under either policy, thus there was no wrongful

denial of benefits.[7]  *See Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455, 462 ("Under South Carolina law, an insurer acts in bad faith when there is no reasonable basis to support the insurer's decision. . . . But if there is a reasonable ground for contesting a claim, there is no bad faith.") (internal citations and quotation marks omitted).  Ability is, therefore, entitled to summary judgment on Plaintiff's claim for bad faith failure to pay benefits.[8]

## CONCLUSION

For the reasons set forth above, Defendant's motions for leave to file a second motion for summary judgment and second motion for summary judgment are GRANTED.  As this disposes of all claims, the Clerk of Court shall enter judgment for Defendant.[9]

IT IS SO ORDERED.

                                                                s/ Cameron McGowan Currie
                                                                CAMERON MCGOWAN CURRIE
                                                                UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
September 21, 2011

---

[7] Plaintiff's claim for bad faith refusal to pay benefits is based on allegations that the denial of benefits was "completely without basis and totally unsubstantiated by any evidence, facts, or policy language." Amended Complaint ¶ XIV.

[8] Ability has advanced additional grounds for dismissal of this claim including arguments relating to Plaintiff's failure to disclose or proffer evidence of damages to Ms. Toney. Given the court's conclusion that the bad faith claim fails because there is no evidence of bad faith, it need not reach those additional arguments.

[9] By supplemental response to the court's inquiries, the parties have indicated that neither requests a declaratory judgment on the issue of the controlling policy. *See* Dkt. No. 66.